Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| In the Matter of the Search of | |
|---|---|
| *(Briefly Describe the property to be searched or identify the person by name and address)* | Case No. 21-319 MB |
| Dark colored cellular phone with the letters LG in pink-colored case; dark colored tablet with the word Lenovo; dark colored cell phone with letters LG; dark colored cell phone with Samsung in dark colored case; and Samsung S20 in dark colored case that were collected by FBI Phoenix ERT during the search of the house on N. Kyyitan Street, Bapchule, AZ on 10/3/21, and are located at the FBI Phoenix Field Office, 21711 N. 7th Street, Phoenix, AZ. | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of ___Arizona___.
(identify the person or describe the property to be searched and give its location):

### As further described in Attachment A.

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### As set forth in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

YOU ARE COMMANDED to execute this warrant on or before _____October 28 2021_____
(not to exceed 14 days)

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the United States Magistrate Judge on duty.

_____
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized (*check the appropriate box*)  ☐ for 30 days (*not to exceed 30*)
☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _October 14 2021 @ 4:30pm_     _____
*Judge's signature*

City and State: _Phoenix, Arizona_     Honorable Michelle H. Burns, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

## RETURN

| Case No.: | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
Executing officer's signature

_____
Printed name and title

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the following electronic devices that were collected by the FBI Phoenix Evidence Response Team during the search of the house on N. Kyyitan Street, Bapchule, AZ on 10/3/21.  The aforementioned electronic devices were collected as evidence following the stabbing of M.H., and are currently located at the FBI Phoenix Field Office, 21711 N. 7th Street, Phoenix, AZ:

1) **Dark-colored cellular phone with the letters LG in pink-colored case, which had been found in the main living room on the couch.**



2) **Dark-colored tablet with the word Lenovo, which had been found in the main living room on the couch.**



3) Dark-colored cell phone with the letters LG, which had been found in the main living room on the couch.



4) Dark-colored cell phone with word Samsung in dark-colored case, which had been found in the bathroom, on the windowsill.



5) Samsung S20 in dark-colored case, which had been found in the master bedroom.



## ATTACHMENT B

All records and communications relating to the violation of Title 18, United States Code § 1111, Murder:

a. Telephone numbers of incoming/outgoing calls stored in the call registry;

b. Telephone numbers and corresponding names to those numbers stored in the cellular telephone's address book;

c. Any incoming/outgoing text messages;

d. Telephone subscriber information;

e. Any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular telephone or SIM Card, including but not limited to e-mail, voicemail, applications and photos.

Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly Describe the property to be searched or identify the person by name and address)*<br>Dark colored cellular phone with the letters LG in pink-colored case; dark colored tablet with the word Lenovo; dark colored cell phone with letters LG; dark colored cell phone with Samsung in dark colored case; and Samsung S20 in dark colored case that were collected by FBI Phoenix ERT during the search of the house on N. Kyyitan Street, Bapchule, AZ on 10/3/21, and are located at the FBI Phoenix Field Office, 21711 N. 7th Street, Phoenix, AZ. | Case No.   21-319MB |

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, SA Daniel Baker, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the District of ___Arizona___, there is now concealed (*identify the person or describe the property to be seized*):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is (*check one or more*):
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. § 1111 | Murder |

The application is based on these facts:
### As set forth in Attachment C, incorporated herein by reference.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Raynette Logan *RP*
*Sworn Telephonically*

_____
*Applicant's Signature*

Daniel F. Baker, SA, FBI
*Applicant's printed name and title*

Date issued: October 14, 2021

_____
*Judge's signature*

City and State: Phoenix, Arizona

Hon. Michelle H. Burns, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to the following electronic devices that were collected by the FBI Phoenix Evidence Response Team during the search of the house on N. Kyyitan Street, Bapchule, AZ on 10/3/21. The aforementioned electronic devices were collected as evidence following the stabbing of M.H., and are currently located at the FBI Phoenix Field Office, 21711 N. 7th Street, Phoenix, AZ:

1) **Dark-colored cellular phone with the letters LG in pink-colored case, which had been found in the main living room on the couch.**



2) **Dark-colored tablet with the word Lenovo, which had been found in the main living room on the couch.**



3) Dark-colored cell phone with the letters LG, which had been found in the main living room on the couch.



4) Dark-colored cell phone with word Samsung in dark-colored case, which had been found in the bathroom, on the windowsill.



5) Samsung S20 in dark-colored case, which had been found in the master bedroom.



## **ATTACHMENT B**

All records and communications relating to the violation of Title 18, United States Code § 1111, Murder:

    a.  Telephone numbers of incoming/outgoing calls stored in the call registry;

    b.  Telephone numbers and corresponding names to those numbers stored in the cellular telephone's address book;

    c.  Any incoming/outgoing text messages;

    d.  Telephone subscriber information;

    e.  Any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular telephone or SIM Card, including but not limited to e-mail, voicemail, applications and photos.

**ATTACHMENT C**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR**

**A SEARCH WARRANT**

I, Daniel F. Baker, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**INTRODUCTION**

The facts of this case, as more fully detailed herein, are that on October 3, 2021, JOEL JUSTIN stabbed and killed M.H., an enrolled member of the Gila River Indian Community, while at a home on North Kyyitan Street, Arizona (AZ), within the exterior boundaries of the Gila River Indian Community (GRIC), in violation of Title 18, United States Code, § 1111, Murder. Subsequent to the stabbing of M.H., the aforementioned residence was searched and processed by the FBI Phoenix Evidence Response Team (ERT). During the course of the search, members of the FBI ERT recovered numerous items that appear to contain DNA, to include multiple electronics, articles of clothing including a tank top and pair of shorts that appear to have a red substance on them that is consistent with blood and a pair of tennis shoes that appears to have multiple drops of a red substance that is consistent with blood on them. In addition, a kitchen knife, which has been alleged to be the knife used to stab M.H. was turned over to investigators by A.B. Finally, multiple electronic devices were collected in various rooms throughout the residence, to include four cellular telephones and one tablet.

I make this affidavit in support of an application for a search warrant, to search the recovered electronic devices, which are described further in Attachment A. The items to be searched for and seized are described in Attachment B. The aforementioned electronic devices

are currently located at the FBI Phoenix Field Office, 21711 North 7th Street, Phoenix, AZ 85024.

## PRELIMINARY BACKGROUND INFORMATION

1.     Your affiant is a graduate of the FBI Academy in Quantico, VA. Your affiant has been employed with the FBI since June 2015. Your affiant is currently assigned to the FBI Phoenix Division and has primary investigative responsibility in Indian Country matters, to include, violent crimes, such as homicide, sexual assaults, and aggravated assaults.

2.     I have been trained in various aspects of law enforcement, including searching and seizing of digital media to include telephone and social media content. In addition, I have been involved in multiple investigations in which digital media, including telephones and social media accounts, have been seized, searched, and forensically examined.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators and witnesses. This affidavit is intended to show merely there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of a violation of Title 18, United States Code, §§ 1111, is located in the electronics seized from the house where the stabbing occurred, more fully described in Attachment A, for items listed in Attachment B. This Court has jurisdiction over these offenses because the below-described events occurred on the GRIC, a federally recognized tribe, and JOEL JUSTIN and M.H. are enrolled members of the GRIC.

### DETAILS OF THE INVESTIGATION

4.      On October 3, 2021, at approximately 6:20 a.m., officers from the Gila River Police Department (GRPD) were dispatched to a house on North Kyyitan Street, Bapchule, AZ (within the boundaries of the GRIC) in reference to a call of a male subject that had been involved in a physical altercation and was heavily bleeding.   Upon arrival, GRPD Officer Chase Ward observed a male subject, later identified as M.H., on the ground, unresponsive. Officer Ward then declared M.H. deceased.   Officer Ward identified M.H. by an AZ Driver's License that was found in the area of M.H.'s body.   Subsequently, detectives from the GRPD Violent Crimes Unit and the FBI Phoenix Central Arizona Safe Trails Task Force (CASTTF) responded to assume the investigation.

5.      GRPD Detective Jacob Rheingans and FBI SA Devin Moynihan first spoke to A.B., who was identified as the girlfriend of M.H.   A.B. had recently started dating M.H.   A.B. explained that on the previous night, October 2, 2021, she and J.M. were driving M.H.'s vehicle when she started to receive threatening messages via Facebook Messenger from R.V., the sister of M.H.'s ex-fiance, C.V.   During the exchange, A.B, and R.V. agreed to fight at A.B.'s residence, which is the location of the stabbing on North Kyyitan Street, Bapchule, AZ.

6.      After A.B. arrived at home, R.V. showed up.   Initially the two argued, but no fight ensued and R.V. ultimately left.   Shortly thereafter, A.B. contacted R.V. and asked her to come back.   R.V. ended up returning to A.B.'s residence.   However, on this occasion, R.V. returned with C.V. and another male, later identified as J.T.   A fight between A.B. and R.V. ensued. A.B. stated that she was intoxicated, but that R.V. was not.   Because of her level of intoxication, A.B. was severely beaten.   During the interview, Detective Rheingans observed

A.B. to have bruising and swelling on her face, notably around her mouth area.  A.B. also had a laceration on her right hand, as well as what appeared to be dried blood in several spots on her clothing.

7.    C.V. eventually broke up the fight but continued to verbally argue with A.B.  At the same time, A.B.'s brother, JOEL JUSTIN, exited the residence and began yelling at and arguing with R.V., C.V. and J.T.  A.B. then attempted to have her dogs attack C.V. and R.V. Though the dogs had not bitten anyone, their presence caused them to get back into their vehicles and leave the area.

8.    Once R.V., C.V. and J.T. left, A.B. went into the residence and into her bedroom, which had been identified as the master bedroom, where M.H. had been sleeping during the entirety of the altercation.  A.B. became very upset with M.H., blaming him for getting beaten up by R.V.  A.B. began throwing things inside the bedroom, yelling at M.H. and ultimately broke the master bedroom door. A.B. told M.H. to pack his belongings and leave the residence. M.H. began to pack his belongings while attempting to locate the keys to his vehicle, so that he could ultimately leave.  While packing his things, M.H. was cornered by JOEL JUSTIN in the hallway bathroom.  A.B. advised that at that same time, multiple children in the residence pleaded with JOEL JUSTIN not to hurt M.H.  M.H. ultimately grabbed his bags and walked out of the residence, while JOEL JUSTIN followed him.

9.    M.H. and JOEL JUSTIN were outside for a period of what was described as "a few seconds" when A.B. exited the front door.  As A.B. walked outside, she observed M.H. laying on the ground and JOEL JUSTIN was walking east, away from the body.  She described JOEL JUSTIN as wearing gray clothing.  A.B. approached the body and observed M.H. was bleeding

4

profusely.  She believed he may have already passed away, as he appeared to be pale.

10.  A.B. believed that M.H. had been stabbed by JOEL JUSTIN.  Prior to M.H. and JOEL JUSTIN walking outside, A.B. overheard JOEL JUSTIN asking his girlfriend, J.M., for a knife.  She further stated that JOEL JUSTIN is known to carry a knife with him.  She believed that the knife may have been a folding knife because he did not go into the kitchen to get a knife.  A.B. finally said that JOEL JUSTIN may have gone to the home of their uncle, W.J., who lived nearby.

11.  Detective Rheingans and SA Moynihan then spoke with A.F., the brother of M.H. A.F. claimed that C.V. had been at his residence the evening prior and that she had left after he went to sleep.  A.F. claimed that C.V. and M.H. had been in a relationship for approximately 12 years.  The two had been engaged to be married, however, M.H. had recently cheated on C.V., causing them to call off their engagement.  A.F. was not aware of who M.H. had cheated with, however he suspected that his infidelity had something to do with his death.

12.  Detective Rheingans and SA Moynihan then spoke with C.V.  C.V. had been messaging M.H. the previous evening, discussing who was going to be paying what bills that each had.  The conversation turned into an argument, causing C.V. to become upset.  C.V. told her sister, R.V., about the conversation, which prompted R.V. to reach out to A.B and threaten to fight her.  C.V. confirmed that the fight occurred in the front yard of A.B.'s residence.  C.V. stated that it was strange that M.H. did not exit the residence the entire time the fight happened.

13.  Detective Rheingans and SA Moynihan also spoke to R.V.  R.V. confirmed that she had gone to A.B.'s home and had fought with A.B. and caused significant damage to M.H.'s vehicle.  However, she did not provide pertinent information regarding the stabbing of

M.H.

14. SA Moynihan spoke to J.F., the brother of M.H. J.F. had known about the previous relationship between C.V. and M.H., as well as M.H. getting into a new relationship. J.F. did not know who M.H.'s new girlfriend was. He could not provide pertinent information related to the stabbing of M.H.

15. As the previous interviews were being conducted, I spoke to C.V., who had called an individual at the crime scene to speak with investigators. Via telephone, C.V. told me that J.C. had been told by JOHN DOE and JANE DOE who had killed M.H. JOHN and JANE DOE, both minor children, told J.C. that "Jo-Jo did it." C.V. advised that it was believed that M.H. was stabbed. Both JOHN and JANE DOE had attempted to save M.H. while he was laying on the ground. C.V. then explained that "Jo-Jo" is known to be "Monica's brother." A.B. is known to go by "Monica." Given the name association, JOEL JUSTIN is A.B.'s brother, and the kids describing the scene, there is probable cause to believe that "Jo-Jo" is JOEL JUSTIN. At the time of the telephone call, C.V. was not aware of the names of the children, just saying it was a boy and a girl.

16. During the course of the investigation, it was learned that JOEL JUSTIN had recently been released from Federal Prison. I contacted U.S. Probation Officer (USPO) Shelley Gonshak-Peters, who confirmed that JOEL JUSTIN was one of her cases. In an attempt to try and locate JOEL JUSTIN, USPO Gonshak-Peters said that she had received a text message from him on Friday, October 1, 2021. In the message, JOEL JUSTIN provided the name of a Phoenix area hotel that he would be staying at in the upcoming days. The text message had been received from telephone number (520) 759-6072, which she knows to

belong to JOEL JUSTIN.

17. Detective Rheingans and SA Moynihan then spoke to J.M., the girlfriend of JOEL JUSTIN. The two have been in a relationship since was released from Federal Prison in July 2021. J.M. and JOEL JUSTIN had been living in various hotels in the Phoenix area, but they had come to A.B.'s residence a few days prior while they waited to check into another hotel. J.M. claimed that the previous night, October 2, 2021, she had been at A.B.'s babysitting the child of a friend of hers. J.M. was awakened by commotion inside the residence. She did not know what the commotion was all about, and she initially did not get out of bed. At some point during the commotion, JOEL JUSTIN walked into her bedroom asking where her pocketknife was. Though she did not know the exact location of the knife, she told him "over there." He then left the room. She was unaware if he retrieved the knife or not.

18. A short time after he left the room, JOEL JUSTIN returned to the room, kissed J.M., told her he loved her and left the room. She was not aware of what he was wearing when he left the room. According to J.M., JOEL JUSTIN keeps several pairs of shoes under their bed, to include a pair of "Converse style shoes." During the interview, J.M. provided written consent for the review of her cellular telephone. Once the interview was completed, Detective Rheingans and SA Moynihan conducted a preliminary review of J.M.'s cellular phone. Detective Rheingans observed text messages from a contact in her phone which was labeled as "My Hubby." The photograph with this contact appeared to be that of who Detective Rheingans knows to be JOEL JUSTIN. Detective Rheingans further observed a text message from "My Hubby" that stated, "I'm fucked aren't I?"

19. During the course of the investigation, elements of the FBI Phoenix Evidence

Response Team (ERT) conducted a search of the house on North Kyyitan Street, Bapchule, AZ to process and collect evidence related to the stabbing of M.H.

20.   During the search, multiple electronic devices were located through the residence. The following devices had been found located in the vicinity of the couch in the living room:

    a.  **Dark-colored cellular phone with the letters LG in pink-colored case**

    b.  **Dark-colored tablet with the word Lenovo**

    c.  **Dark-colored cell phone with the letters LG**

21.   The following device was located in the hallway bathroom:

    a.  **Dark-colored cell phone with word Samsung in dark-colored case**

22.   The following device was found in the bedroom belonging to A.B.:

    a.  **Samsung S20 in dark-colored case**

23.   That Samsung S20 telephone was located in the bedroom that had been previously identified as the master bedroom where M.H. had been sleeping during the altercation between A.B. and R.V.  Given that A.B. had voluntarily provided her cellular telephone to investigators and no cellular device was found on M.H.'s body, there is probable cause that the Samsung S20 found in the bedroom belongs to M.H.

24.   As the search went on, members of the ERT searched a bedroom in the residence that was known to be occupied by J.M. and JOEL JUSTIN.  ERT members located a small black backpack style bag.  Contained inside the bag were a gray tank top and a gray pair of athletic shorts that were covered in a red substance.  Once the clothing was found, I went into the room and observed them.  Based on my training and experiences, the red substance is consistent with what appears to be blood.  In addition to the clothing, I was present when members of the ERT found a pair of black tennis shoes, with white laces, white toe caps and

8

the words "Converse" written on them. I observed there to be a red substance that through my training and experience appears to be consistent with blood.

25. As the search continued, Andre Davis, Investigative Supervisor from the Pinal County Medical Examiner's Office arrived on the scene to collect M.H.'s body. During a preliminary examination of M.H.'s body, Investigator Davis observed what appeared to be one wound that was located in the neck area on the left side of M.H.s head. This wound appeared to have been caused by being stabbed with a sharp object.

26. When the scene was released, investigators went to a house on North Setoyant Street, Bapchule, AZ, the home of W.J., JOEL JUSTIN's uncle, to locate him. At the residence, Detective Rheingans contacted M.J., the girlfriend of W.J. M.J. told Detective Rheingans that JOEL JUSTIN had arrived at the residence at approximately 7:00 a.m. that day. He told M.J. that he had "dropped someone" and that "Monica's boyfriend" had beaten her up. JOEL JUSTIN made several telephone calls. Ultimately JOEL JUSTIN was picked up by an unknown individual in a new, light green pick-up truck. Attempts to located JOEL JUSTIN were unsuccessful.

27. On October 4, 2021, your Affiant conducted an additional review of the cellular phones belonging to A.B., C.V. and J.M. to locate evidence related to M.H.'s death.

28. During a review of A.B.'s telephone, your Affiant located an unknown contact with the telephone number (520) 759-6072. A review of the history between A.B. and the telephone number (520) 759-6072 provided four telephone calls between the two, with the last one coming on October 2, 2021.

29.   The aforementioned screen shot shows that the most recent telephone call between A.B. and the telephone number (520) 759-6072 occurred on October 2, 2021, the night before M.H. was killed.

30.   During a review of C.V.'s cellular telephone, your Affiant observed a conversation between C.V. and a contact named "Kels" in which the fight with A.B. and "Joel's" involvement in an unnamed incident are discussed.  The following screen shots were taken:

10







31.   The aforementioned screen shots show that the conversation between the two took place on October 3, 2021, with conversation beginning just before 6:20 a.m., when M.H.'s body was called in.  The final screen shot then contains a message from "Kels" telling

11

1   C.V., "Fuck, I didn't want to get Joel involved."  Given the previous statements and the nature

2   of the conversation, there is probable cause that "Joel" is JOEL JUSTIN.   This occurs just

3   before investigators were voluntarily provided C.V.'s cellular phone.

4        32.   During a review of J.M.'s cellular phone, your Affiant located contact information

5

6   for a contact named "Hubby."   The contact telephone number for "Hubby" is the telephone

7   number (520) 759-6072.

8

9

10

11

12   

13

14

15

16

17

18

19

20

21        33.   In addition, your Affiant located a text conversation between J.M. and "Hubby"

22

23   which took place on October 3, 2021:

24

25

26

27

28



34.   The aforementioned screen shot shows that the discussion is taking place at the time that investigators have arrived on the scene to process the scene surrounding M.H.'s body. J.M. tells "Hubby": "They have to search everything babe & we have to get out now. They don't want us here."   "Hubby" then replies, "What the fuck for real I'm I fuck u think." Because of this, it is believed that JOEL JUSTIN knows that he is being sought by law enforcement and may seek to hide.

35.   The above conversation appears to be the same conversation that was observed by Detective Rheingans during his interview of J.M.  The contact photograph also appears to be the same photograph he viewed previously, that he knows to be JOEL JUSTIN.   Based on this information, there is probable cause that "Hubby" is JOEL JUSTIN.

36.   On October 4, 2021, an autopsy of M.H.'s body was conducted by Dr. Andrea

Wiens, at the Pinal County Medical Examiner's Office. Dr. Wiens observed one wound to the neck and superficial wounds to each hand. Her preliminary analysis was that M.H. was killed by a stab wound to the neck, and she ruled his death a homicide.

37.   Based on the information provided in this affidavit, a felony arrest warrant was issued by the Gila River Indian Community Criminal Court for the arrest of JOEL JUSTIN on charges of Homicide and Aggravated Assault.

38.   On the evening of October 4, 2021, Detective Rheingans received a call from an unidentified female who requested he call A.B. The unidentified female said it was an "emergency". Detective Rheingans called A.B, who stated, "I have the weapon used to kill Michael". A.B. then stated that after investigators had turned the scene back over to her and left the residence, J.M. told A.B that she had the knife that was used to kill M.H. J.M. told A.B. that she had washed and bleached the knife. J.M. then washed the knife a second time after they were allowed to return to the residence.

39.   On the morning of October 5, 2021, Detective Rheingans spoke to A.B. at her residence. A.B. reiterated that when investigators turned her residence back over to her after the search on the day M.H. was stabbed, J.M told A.B that she had washed and bleached the knife before police had arrived at the house. J.M. then cleaned the knife a second time after police had left.

40.   Further, while J.M was cleaning the house, she also came out from her bedroom and said "Fuck, they found the clothes!", referring to the clothing with an unknown red substance found by the FBI Phoenix ERT in the bedroom identified to have been used by J.M. and JOEL JUSTIN, during the search of the residence. A.B. also stated J.M was speaking to

JOEL JUSTIN on the phone on the evening of October 3, 2021. Finally, A.B stated her grandmother, C.P. had picked J.M up on October 4, 2021, and taken her to stay in a hotel in Phoenix. A.B did not know which hotel J.M. had gone to.

41.   On October 5, 2021, Forensic Interviews were conducted with four minor children that had been present on the evening that M.H. had been stabbed.   All of the interviews were conducted by Child Forensic Interviewer Wendy Dutton at Child Help in Phoenix, AZ.

42.   Prior to the interviews, Detective Rheingans and I interviewed C.P., JOEL JUSTIN's grandmother, who had brought John Doe #1, Jane Doe #2 and Jane Doe #3 to be interviewed. C.P. had picked up the children at the home of R.J. on October 3, 2021, and taken them back to her home in Laveen, AZ. C.P. had been told by her granddaughter that someone had been lying on the ground near the home of A.B. and that "Joel" was responsible. C.P. did not ask who "Joel" was but became very emotional.   She did so because she had known that the children had been at A.B.'s residence for the weekend.

43.   C.P. then explained that she had taken J.M., JOEL JUSTIN's girlfriend, to a hotel in the vicinity of 7th Street and Interstate 10 in Phoenix the previous evening and dropped her off at approximately 6:00 p.m. or 7:00 p.m.   As she dropped J.M. off, C.P. received a telephone call from JOEL JUSTIN, using telephone number (480) 667-7991.   JOEL JUSTIN told her that he needed to protect his family.   He then told her he had to go and hung up the phone.

44.   Dutton first interviewed JANE DOE #1.   JANE DOE #1 initially stated that her uncle, "Joel" had stabbed "Michael" in the neck.   As she stated this, she made a stabbing motion pointing at her neck.   JANE DOE #1 then explained that on the night that this happened, her mother A.B., had gotten into a fight with M.H.'s ex-girlfriend.   A.B. had gotten

scratched, and another unknown male had damaged M.H.'s vehicle.  As a result of the fight, A.B. became upset, argued with M.H. and told him to leave.  During the argument, JOEL JUSTIN retrieved a knife, confronted M.H. and pushed him outside to go and fight.  She said again that JOEL JUSTIN stabbed M.H. "right there," pointing to her neck.

45.   JANE DOE #1 stated that she was inside when the stabbing occurred.  She had been told by her cousin that "Dad stabbed him in the neck."  JANE DOE #1 then looked out the window and observed M.H. laying on the ground.  JANE DOE #1 then said that J.M. had taken the knife from JOEL JUSTIN after the stabbing and washed it in the sink.  JANE DOE #1 stated that she watched J.M. wash the knife.  She further stated that later on A.B. had given the knife to law enforcement.

46.   After the interview, SA Moynihan and I spoke with A.B. about J.M. cleaning the aforementioned knife.  A.B. claimed that J.M. had cleaned the knife and "stabbed" a pan of enchiladas to make it look like it had been used for cooking.  It should be noted that during the search of the residence, a pan of enchiladas had been on the kitchen counter.  The knife was not located during the search.

47.   Dutton then interviewed JOHN DOE #1.  JOHN DOE #1 said that he, JANE DOE #2 and JANE DOE #3 had gone to A.B.'s residence to spend the weekend.  On Saturday, all of the adults began to drink heavily.  At some point in the night, M.H.'s ex-fiancee' came over to A.B.'s residence to confront A.B.  As the confrontation ensued, JOHN DOE #1 attempted to break it up.  The ex-fiancee' ultimately left and returned a short time later with an additional unknown female and an unknown male.  The unknown male ultimately attempted to hit A.B. with a wrench, but JOHN DOE #1 stepped in.  The male turned to hit JOHN DOE #1 until he

realized that he was a "kid." One of JOHN DOE #1's nieces ran into the home and woke up JOEL JUSTIN and informed him what was going on. JOEL JUSTIN went outside and confronted the male. The group finally left the residence.

48.    After the group left, A.B. went inside the residence and woke up M.H., who had been sleeping in her bedroom. A.B. started arguing with M.H. and told him to leave. M.H. had tried to leave and began trying to find his car keys. However, as the two stood in the hallway, they continued to argue. At that point, JOEL JUSTIN got involved. JOEL JUSTIN stepped in between the two of them. This only upset M.H. further. JOEL JUSTIN then grabbed a knife. He told M.H., "You better leave before something happens." JOHN DOE #1 believed that JOEL JUSTIN thought M.H. would hit A.B. He described JOEL JUSTIN as being very mad and that when he gets drunk, JOEL JUSTIN "doesn't even think." M.H. then walked out of the house with A.B. following him outside.

49.    M.H. and A.B. continued to argue as they stood outside and A.B. began to scream. She then called to JOEL JUSTIN, who ran outside. JOHN DOE #1 did not know where JOEL JUSTIN got the knife, but he advised that he "stuck" M.H. in the neck, as he illustrated a stabbing motion towards his neck. JOHN DOE #1 then explained that after JOEL JUSTIN went outside, JOHN DOE #1 had been looking out the window at what was going on. JOHN DOE #1 said that he saw JOEL JUSTIN holding the knife in the air as if to stab M.H. However, M.H. was holding his arm around JOEL JUSTIN's wrist so the knife would not touch him. JOHN DOE #1 advised that he ran outside. Though he did not see the stabbing, when he arrived outside, M.H. was laying on the ground and blood was everywhere. JOHN DOE #1 then described the knife as being a "skinny kitchen knife."

17

50. Dutton then interviewed JANE DOE #2, the daughter of JOEL JUSTIN. JANE DOE #2 had gone with JOHN DOE #1 and JANE DOE #3 to A.B.'s residence for the weekend. Everyone was hanging out until all of the adults started drinking heavily. As the Saturday night progressed, A.B. received a text message from a female JANE DOE #2 referred to as the wife of her "Auntie's boyfriend." Based on the investigation, your Affiant knows her "Auntie" to be A.B, and the boyfriend to be M.H. The "wife" had found out that A.B. and M.H. had been sleeping together and wanted to fight A.B. The "wife" arrived at A.B.'s residence, and they initially just talked before the "wife" left.

51. After she left, A.B. texted the "wife" and told her to come back to the residence. The woman came back, with another unknown female and an unknown male. A.B. and the "wife" began to fight again. The unknown male started damaging M.H.'s vehicle with a rake. When JOHN DOE #1 intervened, it appeared as if the male was going to hit him with the rake. As a result, JANE DOE #2 ran into the residence and told JOEL JUSTIN about what was going on. JOEL JUSTIN came out of the house and confronted the male. Though the two argued, the females and male ultimately left.

52. A.B., who was still drunk, got very upset and ran into the house to wake M.H., who had been sleeping in her room. She repeatedly told M.H. to get up and leave. JANE DOE #2 thought M.H. was about to leave, when she heard her "step-mother" (whom she later identified as "Jessie", and is known to your Affiant as J.M.) yell, "No!" JANE DOE #2 then observed JOEL JUSTIN with a knife in his hand. M.H. ran into the bathroom to get away. As he did, JOEL JUSTIN yelled at him to leave and started to "break the door," ultimately opening it. JANE DOE #2 ran over to JOEL JUSTIN and told him "not to do it." JOHN DOE

18

#1 also told JOEL JUSTIN "not to go back."

53.   As JANE DOE #2 tried to stop JOEL JUSTIN, A.B. pushed her back and out of the way, and told her "that guy deserves this" and "he knew what going to happen." A.B. pushed JANE DOE #2 into the area of the refrigerator and told JOEL JUSTIN to "do it." JOEL JUSTIN kept yelling at M.H. to just leave. M.H. kept asking for his car keys as he and A.B. walked outside.

54.   JOEL JUSTIN had gone back to his room to calm himself down when JANE DOE #3 ran in and told him that M.H. had not left. JOEL JUSTIN got up and "had that knife." J.M. and JOEL JUSTIN then went outside. JANE DOE #2 looked out of the window and watched as JOEL JUSTIN stabbed M.H. in the neck. She said that she watched as JOEL JUSTIN pulled the knife out of M.H.'s neck and blood was going all over him. JOEL JUSTIN then walked back into the house. A.B. ultimately told the children in the house to clean up the blood that had been tracked into the house. JANE DOE #2 discussed how blood got into the house. She stated that when JOEL JUSTIN "stabbed him in the neck...the blood when you take out the knife, it squirts" and it had gotten all over JOEL JUSTIN's shirt. When he came back in the house, he left a blood trail.

55.   At the end of the interview, JANE DOE #2 inquired about her cellular phone that was taken by investigators during the search of the house on North Kyyitan Street. She described it as a clear, glittery phone. Based on the description, there is probable cause that it is the cellular device, a dark colored cellular phone with the letters LG in a pink-colored case (#1 in Attachment A) that was collected from the couch in the living room of the residence. JANE DOE #2 was unsure if any of the events of the evening, including the fight involving

19

A.B. had been recorded.  She explained that she had planned to record the fight to Snapchat, but ultimately did not.  She did not know if anyone else recorded the events of the evening.

56.   Finally, Dutton interviewed JANE DOE #3, the daughter of JOEL JUSTIN.  JANE DOE #3 had gone with JOHN DOE #1 and JANE DOE #2 to A.B.'s residence for the weekend.  When they first arrived, they had been hanging out with their family and playing on their telephones.  She claimed that everything started when someone started breaking "the guy's" car.  She then described "the guy" as A.B.'s boyfriend (whom is known to your Affiant as M.H.).  A.B. had gotten upset and wanted to know who had damaged M.H.'s car.

57.   An unknown female had come over to fight A.B.  When the unknown female arrived, an unknown male had come with her.  The unknown male attempted to fight JOHN DOE #1.  JANE DOE #3 got scared, so she ran into the house to tell JOEL JUSTIN that someone was trying to hurt JOHN DOE #1.  JOEL JUSTIN went outside and confronted the male.  The unknown male and female ultimately left

58.   JOEL JUSTIN went back into the house to lay down.  As he did, A.B. had gotten upset with M.H., who was sleeping in her bedroom.  A.B. started throwing objects at M.H., blaming him for the fight that had just occurred.  As the argument continued, JOEL JUSTIN became upset.  JANE DOE #3 had been in the living room and had not seen anything when she heard "no don't do it" or "something" and saw a knife in JOEL JUSTIN's hand.  M.H. appeared to be trying to "fight back or whatever," and JOEL JUSTIN had approached him with the knife.  However, "they" were able to stop him from doing so.

59.   As the children continued to attempt to stop JOEL JUSTIN, A.B. kept pushing them back, saying "no, he deserves it" and telling JOEL JUSTIN to "do it" and "do it."  JANE

20

DOE #3 questioned why A.B. would say that because A.B. knows how JOEL JUSTIN is. JANE DOE #2 started crying and ran up to JOEL JUSTIN to get into his way.  As she did, A.B. continued to tell the children, that guy "deserves for what my dad is going to do" and kept telling JOEL JUSTIN "to keep doing it," "to do it," "to kill him."  JANE DOE #3 claimed that JOEL JUSTIN appeared confused and didn't know what to do.  She claimed that he didn't want to "do it."  JOEL JUSTIN went back to his room to calm down, and A.B and M.H. walked outside and continued to argue.

60.    As they were outside, JANE DOE #3 heard A.B. yell JOEL JUSTIN's name.  She believed that M.H. may hurt A.B., so she ran into JOEL JUSTIN's room and told him that M.H. was not leaving.  This caused him to get up and walk outside.  JANE DOE #3 did not know what happened next, but she heard screaming as well as JANE DOE #2 and JOHN DOE #1 yelling "stop" or "no."  Shortly thereafter, JOEL JUSTIN walked back into the house with a "whole lot of blood" on his shirt.  JANE DOE #3 walked outside and found that M.H. had been stabbed.  She stated that the police were called, and she attended to M.H.  She ultimately placed a towel on his neck to attempt to stop the bleeding.  JANE DOE #3 said that A.B. had been outside the house, next to M.H.'s body.  To her, it appeared that A.B. was starting to "feel bad" about what had happened.

61.    During the afternoon of October 5, 2021, Detective Rheingans, SA Moynihan and I attempted to locate J.M. at her place of work, a Walmart located in the vicinity of Southern Avenue and 35th Avenue in Phoenix, AZ.  As investigators arrived and walked into the store, an individual that appeared to be JOEL JUSTIN was located sitting outside of the entrance.  Investigators ultimately took JOEL JUSTIN into custody without incident.

62. Detective Rheingans and your Affiant interviewed JOEL JUSTIN subsequent to his arrest. During the interview, JOEL JUSTIN declined to answer any questions and requested that he have a lawyer present before any additional questioning was conducted.

63. Given the above information, there is probable cause that multiple electronic devices may contain information regarding the stabbing of M.H. Based on training and experience, I know that family members communicate with each other via cellular telephone and other electronic devices. It is further in my experience that in matters of criminal activity, family members discuss those events over those electronic devices. In addition, after reviewing the cellular phones that were provided with consent to search, individuals present at the residence, including JOEL JUSTIN have already discussed aspects of the events surrounding the stabbing of M.H. Because of this, there is probable cause that the events surrounding M.H.'s death were likely transmitted to other individuals at the residence, most notably other family members.

64. Also found in the residence was what is believed to be a cellular device belonging to M.H. It is my experience that information surrounding events leading up to an individual's death are typically memorialized on a victim's cellular telephone, whether it be in a call log, use of messaging services or as part of a social media application.

## CONCLUSION

65. Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts as set forth in this affidavit, there is sufficient probable cause to believe a violation of Title 18, U.S.C., § 1111, Murder, has been committed, and evidence of the crime will be found in the electronic devices described in this Affidavit

and Attachment A.   I believe that names, nicknames, and/or telephone numbers of other subjects involved in, and associated with the murder, as well as data describing the time, date, the duration of incoming and outgoing calls to the cellular phones, incoming and outgoing text messages, and other electronic data as listed in Attachment B, will be located on the electronic devices. Wherefore, your affiant respectfully requests a warrant be issued authorizing Special Agents to examine, analyze, and make record of the contents of the information stored in the seized electronics described in this Affidavit and Attachment A, which is presently in the custody of the FBI. This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: __10/14/21__                    _____
                                                Special Agent Daniel F. Baker
                                                Federal Bureau of Investigation

Subscribed and sworn to before me this __14__ day of October, 2021.

                                        _____
                                        Honorable Michelle H. Burns
                                        United States Magistrate Judge
                                        District of Arizona

23